IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

PQ LABS, INC.,

      Plaintiff,

   v.

YANG QI, ZAAGTECH, INC., JINPENG
LI, and HAIPENG LI,

      Defendants.

_____/

No. 12-0450 CW

ORDER GRANTING IN
PART DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT (Docket
No. 78); GRANTING
DEFENDANTS' MOTION
TO AMEND (Docket
No. 96)

    Plaintiff PQ Labs, Inc. brought this action against Defendants Yang Qi, Jinpeng Li, Haipeng Li, and ZaagTech, Inc. for misappropriation of trade secrets, copyright infringement, trademark infringement, breach of contract, and various other business-related torts.  Defendants move for summary judgment on all claims.  In addition, they move for leave to amend their answer and one of their responses to Plaintiff's requests for admissions.  Plaintiff opposes both motions.  After considering the parties' submissions and oral argument, the Court grants in part the motion for summary judgment and denies it in part and grants the motion for leave to amend.

BACKGROUND

    The following facts are undisputed except where otherwise noted.

    PQ Labs is a California corporation that manufactures and develops hardware and software for computer touch-screen products.

Docket No. 87, Declaration of Fei "Frank" Lu ¶ 1.  In February 2009, it entered into a contract with 22Miles, Inc. for "management and human resource services."  Id., Ex. B, Vendor Agreement, at 1.  Specifically, PQ Labs asked 22Miles to provide it with an independent contractor "to answer pre-sale engineering inquiries and perform sales service & support for PQ's products in the United States."  Docket No. 88, Declaration of Joey Zhao ¶ 3.  22Miles hired Yang Qi to play this role and assigned him to serve as PQ Labs' "account manager" for a term of one year.  Id. ¶ 3; Lu Decl. ¶ 8, Ex. B, at 2-3.  The vendor agreement between PQ Labs and 22Miles provided that Yang Qi's term would be renewed automatically at the end of the year unless either party expressly sought to terminate the agreement.  Id. at 2.

Yang Qi worked in PQ Labs' San Jose office from February 2009 until April 2010, when PQ Labs terminated the vendor agreement.  Id. ¶ 11; Docket No. 80, Declaration of Yang Qi ¶ 8.  During that period, he managed the company's global sales operations, including its relationships with distributors and customers.  Lu Decl. ¶ 11; Qi Decl. ¶¶ 3, 6.  His duties gave him access to "all of PQ Labs' customer contact information, pricing lists, customer discount information, and marketing lists."  Lu Decl. ¶ 11.

In June 2009, four months after Yang Qi was assigned to PQ Labs, Jinpeng Li was hired as a hardware engineer by PinQi Digital Technology Company, Ltd., a wholly-owned subsidiary of PQ Labs based in Shanghai.  Lu Decl. ¶¶ 2, 14; Docket No. 81, Declaration of Jinpeng Li ¶ 2.  In that capacity, Jinpeng Li had access to various "hardware designs and schematics" for PQ Labs' products.

Lu Decl. ¶¶ 14-15.  Jinpeng Li was terminated by PinQi sometime after May 2010.[1]

In this suit, PQ Labs alleges that Yang Qi and Jinpeng Li misappropriated several of its trade secrets, including hardware schematics, confidential customer information, and software code. Docket No. 39, Second Amended Complaint (2AC) ¶¶ 12-42.  It further alleges that they worked with a third individual, Haipeng Li, to form a sham distributorship in order to divert sales away from PQ Labs.  Id.  Finally, it alleges that Yang Qi and Jinpeng Li used the confidential information they stole from PQ Labs to help form a competing touch-screen technology company in China called ZaagTech, Inc.  Id.  The operative complaint charges Defendants with misappropriation of trade secrets, copyright infringement, trademark infringement, false advertising, tortious interference with contract and prospective economic advantage, breach of contract, breach of fiduciary duty, fraudulent concealment, conversion, trespass to chattels, violations of the federal Computer Fraud and Abuse Act, violations of California Penal Code section 502, and unfair competition.  Id. ¶¶ 43-173.

DISCUSSION

I.   Motion for Summary Judgment

     A.   Legal Standard

     Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is

_____

[1] The parties failed to submit evidence identifying the exact date of Jinpeng Li's termination; however, company e-mails indicate that he was still employed there at least until May 26, 2010.  Lu Decl., Ex. G, May 26, 2010 E-Mail from F. Lu to J. Li.

United States District Court
For the Northern District of California

clearly entitled to prevail as a matter of law.  Fed. R. Civ.

P. 56; <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986);

<u>Eisenberg v. Ins. Co. of N. Am.</u>, 815 F.2d 1285, 1288-89 (9th Cir.

1987).

The moving party bears the burden of showing that there is no material factual dispute.  Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material.  <u>Celotex</u>, 477 U.S. at 324; <u>Eisenberg</u>, 815 F.2d at 1289.  The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986); <u>Intel Corp. v. Hartford Accident & Indem. Co.</u>, 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case.  The substantive law will identify which facts are material.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods:

> The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial.

<u>Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc.</u>, 210 F.3d 1099, 1106 (9th Cir. 2000).

If the moving party discharges its burden by showing an absence of evidence to support an essential element of a claim or

United States District Court
For the Northern District of California

defense, it is not required to produce evidence showing the absence of a material fact on such issues, or to support its motion with evidence negating the non-moving party's claim.  <u>Id.</u>; see also <u>Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 885 (1990); <u>Bhan v. NME Hosps., Inc.</u>, 929 F.2d 1404, 1409 (9th Cir. 1991).  If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." <u>Bhan</u>, 929 F.2d at 1409.

If the moving party discharges its burden by negating an essential element of the non-moving party's claim or defense, it must produce affirmative evidence of such negation.  <u>Nissan</u>, 210 F.3d at 1105.  If the moving party produces such evidence, the burden then shifts to the non-moving party to produce specific evidence to show that a dispute of material fact exists.  <u>Id.</u>

If the moving party does not meet its initial burden of production by either method, the non-moving party is under no obligation to offer any evidence in support of its opposition. <u>Id.</u>  This is true even though the non-moving party bears the ultimate burden of persuasion at trial.  <u>Id.</u> at 1107.

B.   Misappropriation of Trade Secrets (Claims 1, 2)

PQ Labs alleges that Yang Qi, Jinpeng Li, and ZaagTech misappropriated seventeen of its trade secrets, including certain hardware design schematics, software algorithms and code, customer lists and contact information, and other proprietary information. Docket No. 85, Declaration of Bonnie Wolf ¶ 2.

To prevail on a claim for misappropriation of trade secrets under the California Uniform Trade Secrets Act (CUTSA), Cal. Civ. Code §§ 3426 through 3426.11, a plaintiff must show that (1) it owned a trade secret; (2) the defendant acquired, disclosed, or used that trade secret through improper means, and (3) the defendant's actions damaged the plaintiff.  Cytodyn, Inc. v. Amerimmune Pharmaceuticals, Inc., 160 Cal. App. 4th 288, 297 (2008).  CUTSA defines a "trade secret" as,

> information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> (1)  Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and
>
> (2)  Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Cal. Civ. Code § 3426.1(d).  Here, Defendants contend that PQ Labs has failed to present sufficient evidence to support an inference that it took reasonable steps to maintain the secrecy of its alleged trade secrets.  This argument is not persuasive.

PQ Labs' evidence highlights the various measures it took to protect the information which Defendants allegedly misappropriated.  The company's CEO and founder, Frank Lu, stated in his declaration that he expressly told Yang Qi on March 2, 2009 not to disclose any of PQ Labs' "product design concept[s], implementation details, algorithms (both in conceptual level and in detailed level [sic]), schematics, bill of materials, customer lists and related information."  Lu Decl. ¶ 12.  Lu specifically

United States District Court
For the Northern District of California

explained that this information "constituted PQ trade secrets" and "if other people, companies or potential competitors had access to this information it would have severe negative consequences for PQ's business." Id. PQ Labs' vendor agreement with 22Miles also included a provision prohibiting 22Miles and its employees from disclosing any of PQ Labs' confidential information or using that information to gain a competitive advantage over PQ Labs. Id., Ex. B, at 2-3. Consistent with this provision, Yang Qi signed a nondisclosure agreement with 22Miles in July 2009 which required him to keep confidential PQ Labs' "[c]ustomer lists," "pricing techniques and strategies," "parts, drawings, data, sketches, plans, programs, specifications, techniques, processes, and other information relating to equipment and its use," and "[s]oftware designs, source code, object code, and any techniques, processes, methods or designs relating to multi-touch." Id., Ex. D, Confidentiality & Unfair Competition Agreement, at 12. The CEO of 22Miles asserted in his declaration that he also instructed Yang Qi "to keep any information that he received from or about PQ and 22Miles in the strictest confidence and not disclose [it] to any third parties." Zhao Decl. ¶ 7.

Like Yang Qi, Jinpeng Li was also explicitly warned not to disclose any confidential information about PQ Labs' customers or touch-screen technology. Lu stated in his declaration that he told Jinpeng Li to keep confidential "all information regarding PQ's Multi-Touch overall product design concept, implementation details, algorithms," and other technical information when PinQi hired Jinpeng Li in June 2009. Id. ¶ 16.

United States District Court
For the Northern District of California

According to Lu's declaration, all PQ Labs employees received similar warnings and those with access to sensitive information were required to sign confidentiality agreements. Id. ¶ 5.[2] Lu also noted that the company rigidly controls access to its research, development, and production facilities with fingerprint scanners and security personnel and relies on passwords and firewalls to protect its electronic information. Id. ¶ 6. These protocols are sufficient to support an inference that PQ Labs took reasonable measures to protect its trade secrets. MAI Systems Corp. v. Peak Computer, Inc., 991 F.2d 511, 521 (9th Cir. 1993) ("MAI required its employees to sign confidentiality agreements respecting its trade secrets, including the Customer Database. Thus, under the [C]UTSA, the MAI Customer Database constitutes a trade secret."); Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc., 923 F. Supp. 1231, 1253-54 (N.D. Cal. 1995) (finding that the plaintiff organization "put forward sufficient evidence that it took steps that were reasonable under the circumstances to protect its purported trade secrets" by submitting a declaration from its president documenting the organization's use of "security personnel," "electronic sensors attached to documents," and "confidentiality agreements for all of those given access to the materials").

---

[2] PQ Labs submitted examples of three such confidentiality agreements. Lu Decl., Ex. A. Defendants object to these documents on the grounds that they were signed well after Jinpeng Li and Yang Qi were hired. They also note that PQ Labs failed to produce these documents during discovery. While these points may cast doubt on the validity of this evidence and may even provide evidence of a discovery violation, the documents are nevertheless sufficient -- when combined with the other evidence presented -- to support an inference that PQ Labs took reasonable precautions to protect its trade secrets.

United States District Court
For the Northern District of California

Defendants argue that the security measures that PQ Labs has identified do not constitute reasonable efforts to protect its trade secrets because they do nothing to prevent reverse-engineering of its products.  Defendants point, in particular, to PQ Labs' four trade secrets relating to "printed circuit board" technology, claiming that these trade secrets are susceptible to reverse-engineering.  The only evidence Defendants provide to support this claim, however, is Lu's deposition testimony, during which he stated that "if you have billions of dollars, you can reverse engineer possibly everything."  Docket No. 79-9, Declaration of Perry Narancic, Ex. 9, Lu Depo. 118:11-119:3 ("As long as you have the money, you have the time, you have the people, you can do that, yeah.  Everything is possible.").  This perfunctory statement -- that "anything" is susceptible to reverse-engineering given enough time and resources -- does not demonstrate that PQ Labs failed to make reasonable efforts to prevent reverse-engineering of its products.  Nor does it show that PQ Labs' other efforts to protect its printed circuit board technology were not "reasonable under the circumstances."  Cal. Civ. Code § 3426.1(d)(2).

The cases that Defendants cite for support do not suggest otherwise.  For instance, in Entertainment Research Group, Inc. v. Genesis Creative Group, Inc., the Ninth Circuit held that a defendant was entitled to summary judgment on a claim for breach of confidentiality because it had presented "substantial evidence indicating that [the plaintiff] never took any steps to prevent other manufacturers from looking inside [the plaintiff's products] and reverse-engineering them."  122 F.3d 1211, 1227 (9th Cir.

1997) (ERG).  Defendants here, in contrast, have not presented
"substantial evidence" that PQ Labs similarly failed to erect any
barriers to reverse-engineering; instead, as noted above, they
have merely presented Lu's testimony acknowledging that "possibly
everything" can be reverse-engineered.  Furthermore, even if
Defendants had presented evidence showing that PQ Labs failed to
prevent reverse-engineering, ERG would not govern the outcome of
this case for another reason: the decision applied the legal
standard for breach-of-confidentiality claims rather than the
standard for trade secret claims.  See id. ("Information need not
be protectable either as a trade secret or by copyright law to be
the subject of a breach of confidentiality claim.").

The district court cases that Defendants cite are likewise
inapposite.  In Gemisys Corp. v. Phoenix America, Inc., 186 F.R.D.
551 (N.D. Cal. 1999), this Court granted summary judgment to the
defendant on a trade secret claim because the plaintiff failed to
mark its alleged trade secrets as confidential.  That marking
requirement, however, is irrelevant here because, as outlined
above, PQ Labs has presented evidence that it used other means to
notify its employees and agents that its technological and
customer information was confidential.  Moreover, the trade secret
claims in Gemisys were brought under Colorado's trade secret
statute, not CUTSA, and the marking requirement was derived from
Tenth Circuit case law.  See id. at 558 (citing Jensen v.
Redevelopment Agency of Sandy City, 998 F.2d 1550, 1557 (10th Cir.
1993)).  Thus, Gemisys does not apply here.

The Central District of California's decision in HiRel
Connectors, Inc. v. United States, 2005 WL 4958547 (C.D. Cal.),

also differs from the present case in important respects.  There, the court granted partial summary judgment to the defendant because the plaintiff failed to act quickly to protect its trade secrets, even after it learned that the trade secrets had been published online.  Id. at *5.  The court concluded that, because the plaintiff waited more than two years to protect its confidential information after it was disclosed publicly, the information ceased to be a trade secret.  Id.  Here, in contrast, PQ Labs waited only twenty months to file this suit once it learned of Defendants' possible misappropriation.  This period is comparable to the eighteen-month delay in filing suit that the court found permissible in HiRel.  See id. at *7 ("The Court finds it would not be appropriate at this time to set any earlier date certain [i.e., earlier than eighteen months from the publication date] after which Plaintiff lost its rights to those trade secrets.").  More importantly, PQ Labs' alleged trade secrets were never disclosed in a public forum.  As the HiRel court explained, once a plaintiff's trade secret has been publicly disclosed, "merely filing suit against the alleged wrongdoer does not constitute 'reasonable efforts' to protect the trade secrets against others who might be interested in obtaining those secrets."  Id. at *6 (emphasis in original).  This rationale does not apply in the present case, where PQ Labs' trade secrets were never publicly disclosed.

Finally, Defendants cannot rely on FormFactor, Inc. v. Micro-Probe, Inc., 2012 WL 2061520 (N.D. Cal.), for support because the court in that case expressly found that there was "no evidence that [the plaintiff] made reasonable efforts to protect the

United States District Court
For the Northern District of California

secrecy of any particular trade secret." <u>Id.</u> at *7 (emphasis added).[3]  As noted above, PQ Labs has presented various pieces of evidence documenting its reasonable efforts to protect its trade secrets.  Accordingly, Defendants are not entitled to summary judgment on PQ Labs' CUTSA claims.

C.   Copyright Infringement (Claim 3)

PQ Labs alleges that Yang Qi, Jinpeng Li, and ZaagTech infringed its copyright in the "PQ Labs MultiTouch System Software," Copyright Registration No. TXu 1-620-335, by using the software to develop and sell their own touch-screen products.

To survive summary judgment on this claim, PQ Labs must present sufficient evidence to support an inference that (1) it owned a valid copyright; and (2) Defendants violated its exclusive rights under the Copyright Act.  <u>Ellison v. Robertson</u>, 357 F.3d 1072, 1076 (9th Cir. 2004).  "If the plaintiff copyright holder survives the first step, i.e., it establishes that it owns a valid copyright, then the plaintiff must establish infringement by showing both access to its copyrighted material on the part of the alleged infringer and substantial similarity between the copyrighted work and the alleged infringing work."  <u>N. Coast Indus. v. Jason Maxwell, Inc.</u>, 972 F.2d 1031, 1033 (9th Cir. 1992).

PQ Labs has satisfied all of these requirements here.  First, it has presented evidence that it owns a valid copyright for its MultiTouch System Software and that Yang Qi, Jinpeng Li, and

---

[3] The <u>FormFactor</u> court's decision was also subsequently vacated pursuant to a stipulation between the parties, <u>see</u> 2012 WL 6554020, at *1 (N.D. Cal.).

ZaagTech had access to that software.  As noted above, Lu stated in his declaration that Yang Qi and Jinpeng Li had access to PQ Labs' technological information when they worked for the company. See, e.g., Lu Decl. ¶ 14 ("Jinpeng Li was hired by PinQi to develop hardware exclusively for PQ's products, and those are the type of services that Mr. Li rendered for PinQi and PQ while he was working at PinQi, which gave him access to (and extensive work experience with) PinQi's and PQ's technological information."). Furthermore, Jinpeng Li admitted that he began working for ZaagTech after he was terminated by PinQi.  See Wolf Decl., Ex. O, Jinpeng Li Resp. Req. Admission No. 14, at 5-6.  Taken together, this evidence is sufficient to support an inference that all Defendants had access to the copyrighted software.

PQ Labs has also presented evidence that its touch-screen products are substantially similar to those developed by ZaagTech. Its expert, Dr. Andrew Wolfe, stated in his report that the high degree of similarity between the two companies' products suggests that ZaagTech's products were created using PQ Labs' technology, including its algorithms and software.  Docket No. 91, Declaration of Andrew Wolfe ¶¶ 1-2, 4-5, 8.  This finding supports an inference that Defendants used a copy of PQ Labs' software without its consent.  MAI Systems, 991 F.2d at 518-19 ("The law also supports the conclusion that Peak's loading of copyrighted software into RAM creates a 'copy' of that software in violation of the Copyright Act."); see also Airframe Systems, Inc. v. Raytheon Co., 520 F. Supp. 2d 258, 267 (D. Mass. 2007) ("With regard to software, an act of copying sufficient to violate the Copyright Act occurs each time the software is run.").  Thus,

United States District Court
For the Northern District of California

Wolfe's report and Lu's declaration are sufficient to satisfy PQ Labs' summary judgment burden with respect to its copyright claim.

Defendants note that Wolfe failed to state conclusively in his declaration that Defendants actually copied PQ Labs' software. However, at this stage in the litigation, PQ Labs does not need to establish definitively that actual copying occurred. Rather, as noted above, it is enough for PQ Labs to present evidence supporting an inference of infringement based on (1) Defendants' access to the copyrighted information and (2) substantial similarities between its own products and ZaagTech's allegedly infringing products. Because PQ Labs has met this burden, Defendants are not entitled to summary judgment on this claim.

D.   Trademark Infringement: Lanham Act (Claim 5)

PQ Labs alleges that Yang Qi, Jinpeng Li, and ZaagTech violated the Lanham Act by using the mark, "PQ LABS," Trademark Registration No. 4075660, to advertise falsely that ZaagTech was a distributor and manufacturer of PQ Labs' touch-screen products.

"To prevail on a claim of trademark infringement under the Lanham Act, 15 U.S.C. § 1114, a party 'must prove: (1) that it has a protectible ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion.'" Network Automation, Inc. v. Advanced Sys. Concepts, Inc., 638 F.3d 1137, 1144 (9th Cir. 2011) (citing Dep't of Parks & Recreation v. Bazaar Del Mundo Inc., 448 F.3d 1118, 1124 (9th Cir. 2006)).

Here, PQ Labs has submitted screenshots of multiple websites which advertise ZaagTech products and refer to ZaagTech as "China PQ Labs Manufacturer" and "PQ Labs manufacturer and exporter in

14

China."  Lu Decl., Ex. I, at 1-3.  These advertisements suggest a formal business relationship between ZaagTech and PQ Labs and, as such, could lead consumers to believe that ZaagTech's products were designed or developed by PQ Labs.  Because PQ Labs does not have any formal business relationship with ZaagTech, these web advertisements are sufficient to support an inference that ZaagTech infringed PQ Labs' trademark.[4]

The advertisements are not, however, sufficient to support an inference that Yang Qi or Jinpeng Li infringed its trademark.  PQ Labs has not presented any evidence to suggest that Yang Qi or Jinpeng Li were responsible for the ZaagTech web advertisements or that they otherwise infringed PQ Labs' trademark.  Yang Qi and Jinpeng Li are therefore entitled to summary judgment on this claim.

The advertisements also fail to support an inference that PQ Labs suffered damages as a result of this alleged infringement. The Ninth Circuit has made clear that, in order to recover monetary damages for trademark infringement, a plaintiff "must prove both the fact and the amount of damage." Lindy Pen Co., Inc. v. Bic Pen Corp., 982 F.2d 1400, 1407 (9th Cir. 1993).  PQ Labs has not done so here.  Although it asserts that its "damages due to trademark infringement are a subset of [its] damages on its trade secrets claim," Docket No. 84, Pl.'s Opp. at 17, it has not

_____

[4] The only case Defendants cite for support, Burger King Corp. v. Cabrera, comes from the report and recommendation of a magistrate judge in the Southern District of Florida and merely restates the standard for trademark infringement.  2010 WL 5834869, at *4 (S.D. Fla.) ("It is also essentially undisputed that Cabrera's use of the Burger King name and marks, if unauthorized, will confuse the public as to the source, origin, sponsorship, or affiliation of Defendant's goods.").

United States District Court
For the Northern District of California

cited any damages report or other evidence to support that assertion.  Accordingly, ZaagTech is entitled to summary judgment on PQ Labs' trademark infringement claim to the extent PQ Labs seeks monetary damages.  PQ Labs may proceed on this claim against ZaagTech to the extent it seeks declaratory or injunctive relief but it may not recover monetary damages under the Lanham Act.

E.   Trademark Infringement: California Law (Claims 4, 8)

PQ Labs asserts trademark infringement claims against Yang Qi, Jinpeng Li, and ZaagTech under California law.  These claims are "subject to the same test" as their trademark infringement claims under the Lanham Act.  Jada Toys, Inc. v. Mattel, Inc., 518 F.3d 628, 632 (9th Cir. 2008) (citations omitted); see also Mallard Creek Indus., Inc. v. Morgan, 56 Cal. App. 4th 426, 435 (1997) ("[T]he ultimate test under both federal and California law is whether the similarity between the two marks is likely to deceive or confuse the public.").  Thus, because PQ Labs has submitted sufficient evidence to support an inference that ZaagTech engaged in trademark infringement under the Lanham Act, it has also submitted sufficient evidence to support an inference that ZaagTech engaged in trademark infringement under California law.

As explained above, however, PQ Labs has not presented any evidence that Yang Qi or Jinpeng Li infringed its trademark or that it suffered damages as a result of ZaagTech's alleged infringement.  Thus, as with the Lanham Act claims, Yang Qi and Jinpeng Li are entitled to summary judgment on this claim and PQ Labs may seek only declaratory and injunctive relief from ZaagTech on this claim.

United States District Court
For the Northern District of California

F.    False Advertising: Lanham Act (Claim 6)

PQ Labs alleges that Yang Qi, Jinpeng Li, and ZaagTech violated the Lanham Act's false advertising provisions by posting the web advertisements described above.

To prevail on a claim for false advertising under the Lanham Act, a plaintiff must show:

> (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products.

Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1139 (9th Cir. 1997) (citing 15 U.S.C. § 1125(a)).

In this case, the web advertisements support an inference that ZaagTech engaged in false advertising under the Lanham Act. Although Defendants argue that these advertisements do not contain false statements about PQ Labs' products, the advertisements do contain an allegedly false statement about ZaagTech's own touch-screen products. This is sufficient to support an inference that ZaagTech violated the Lanham Act. See id. (recognizing that liability may be imposed for any "false statement of fact by the defendant in a commercial advertisement about its own or another's product" (emphasis added)).

Nevertheless, PQ Labs has not submitted any evidence that Yang Qi or Jinpeng Li are responsible for these advertisements nor

United States District Court
For the Northern District of California

that it suffered any damages as a result of Defendants' allegedly misleading advertisements.  Thus, just as with its trademark infringement claims, Yang Qi and Jinpeng Li are entitled to summary judgment on this claim and PQ Labs may not recover any monetary relief from ZaagTech.  See Harper House, Inc. v. Thomas Nelson, Inc., 889 F.2d 197, 210 (9th Cir. 1989) (emphasis in original) ("In a suit for damages under section 43(a) [of the Lanham Act], however, actual evidence of some injury resulting from the deception is an essential element of the plaintiff's case.").  It may proceed on this claim against ZaagTech only insofar as it seeks declaratory or injunctive relief.

G.   False Advertising: California Law (Claim 7)

PQ Labs' state law false advertising claims are based on the same advertisements as its Lanham Act claims.

Section 17500 of the California Business and Professions Code makes it unlawful for a business to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."  To prevail on a claim under this provision, "it is necessary only to show that members of the public are likely to be deceived" by a given advertisement.  Kasky v. Nike, Inc., 27 Cal. 4th 939, 951 (2002).

Here, PQ Labs' screenshots of the web advertisements are sufficient to support an inference that ZaagTech violated section 17500.  As explained above, these advertisements allegedly misrepresent the nature of PQ Labs' relationship with ZaagTech and PQ Labs' contributions to ZaagTech's products.  Accordingly, ZaagTech is not entitled to summary judgment on this claim.  See

18

<u>Denbicare U.S.A. Inc. v. Toys R Us, Inc.</u>, 84 F.3d 1143, 1153 (9th Cir. 1996) (concluding that the dismissal of the plaintiff's section 17500 claims was proper because the dismissal of its Lanham Act claims was proper), <u>abrogated on other grounds by Kirtsaeng v. John Wiley & Sons, Inc.</u>, 133 S. Ct. 1351 (2013).

Nevertheless, Yang Qi and Jinpeng Li are entitled to summary judgment on this claim for the same reasons they are entitled to summary judgment on PQ Labs' claims under the Lanham Act. Furthermore, just as with its Lanham Act claims, PQ Labs may not recover damages from ZaagTech on this claim and may seek to recover only declaratory and injunctive relief. California law precludes private litigants from obtaining monetary relief for false advertising claims brought under section 17500. <u>Chern v. Bank of Am.</u>, 15 Cal. 3d 866, 875 (1976) (recognizing that section 17500 does "not authorize recovery of damages by private individuals"); <u>Brown v. Allstate Ins. Co.</u>, 17 F. Supp. 2d 1134, 1140 (S.D. Cal. 1998) (stating that, under section 17500, "private remedies are limited to equitable relief, and civil penalties are recoverable only by specified public officers").

H.   Computer Fraud and Abuse Act (Claim 19)

PQ Labs alleges that, between January 2011 and December 2011, Yang Qi, Jinpeng Li, and ZaagTech sent several "phishing" e-mails to PQ Labs in violation of the federal Computer Fraud and Abuse Act (CFAA), 18 U.S.C. §§ 1030 <u>et seq.</u> These e-mails allegedly contained viruses which infected PQ Labs' computer system. Lu Decl. ¶¶ 28-29.

"The CFAA prohibits a number of different computer crimes, the majority of which involve accessing computers without

19

United States District Court
For the Northern District of California

authorization or in excess of authorization, and then taking specified forbidden actions, ranging from obtaining information to damaging a computer or computer data."  LVRC Holdings LLC v. Brekka, 581 F.3d 1127, 1131 (9th Cir. 2009).  Among other acts, the statute makes it unlawful for any person to "knowingly cause[] the transmission of a program, information, code, or command, and as a result of such conduct, intentionally cause[] damage without authorization, to a protected computer."  18 U.S.C. § 1030(a)(5)(A).[5]

The CFAA provides that a "civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i)."  Id. § 1030(g).  Thus, to prevail in a civil action under the CFAA, a plaintiff must show that the defendant's conduct involves one of the following factors:

> (I)    loss to 1 or more persons during any 1-year period (and, for purposes of an investigation, prosecution, or other proceeding brought by the United States only, loss resulting from a related course of conduct affecting 1 or more other protected computers) aggregating at least $5,000 in value;
>
> (II)   the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of 1 or more individuals;
>
> (III)  physical injury to any person;
>
> (IV)   a threat to public health or safety; [or]
>
> (V)    damage affecting a computer used by or for an entity of the United States Government in furtherance of the administration of justice, national defense, or national security; . . .

---

[5] In its brief, PQ Labs failed to identify the specific provisions of the CFAA that Defendants allegedly violated.  At the hearing, however, it indicated that it was alleging a violation of § 1030(a)(5).

18 U.S.C. § 1030(c)(4)(A)(i).  Only the first of these factors -- namely, economic loss -- is relevant here.

Lu stated in his declaration that PQ Labs received at least "five e-mails containing malicious code" in 2011 and that the company "expended significant resources identifying and remediating the damage caused by this malware."  Decl. ¶ 29. Specifically, Lu asserted that the company spent "$36,000 in costs to mitigate the damages to the hardware and network, and $42,000 in consulting fees and service costs."  Id.  Lu also explained why he believes these e-mails were sent by Yang Qi, Jinpeng Li, and ZaagTech, noting that they were sent to non-public e-mail addresses and made reference to several former PQ Labs employees using the specific Chinese characters for these employees' names. Id. ¶ 30.  The messages also contained detailed information about PQ Labs' customers.  Id.  According to Lu, Yang Qi, Jinpeng Li, and ZaagTech are among the few people or entities which not only had access to all of this information but also possessed the technical skills and language ability to craft these e-mails.  Id.

Defendants contend that Lu's declaration conflicts with his prior deposition testimony and, therefore, should be disregarded under the sham affidavit rule.  That rule provides that "a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony."  Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262, 266 (9th Cir. 1991).  The Ninth Circuit has "recognized that the sham affidavit rule 'should be applied with caution'" because it "threatens to ensnare parties who may have simply been confused during their deposition testimony and may encourage

**United States District Court**
For the Northern District of California

gamesmanship by opposing attorneys." <u>Van Asdale v. Int'l Game</u> <u>Tech.</u>, 577 F.3d 989, 998 (9th Cir. 2009) (citations omitted). "In order to trigger the sham affidavit rule, the district court must make a factual determination that the contradiction is a sham, and the 'inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit.'" <u>Yeager v. Bowlin</u>, 693 F.3d 1076, 1080 (9th Cir. 2012) (citing <u>Van Asdale</u>, 577 F.3d at 998-99).

Here, the inconsistencies between Lu's deposition testimony and his declaration do not rise to this level. When asked whether any of the alleged phishing e-mails "caused damage to PQ Labs' network, [sic] or computer systems," Lu responded,

> That I don't know exactly, because, you know, when we received the e-mail, and we checked with over 60 anti-virus software, and only less than five percent of the anti-virus software can detect that. . . . So, the virus could be hidden in our computer for years, you know? That's a tremendous risk for us.

Narancic Decl., Ex. 13, Lu Depo. 104:3-:11. Lu also testified that PQ Labs' hard drive crashed but admitted that he did not know whether the virus sent by the phishing e-mails was the cause of the crash. <u>Id.</u>, Ex. 13, at 110:1-:11. This testimony -- in which Lu admits to some uncertainty about the cause of the network damage -- do not "clear[ly] and unambiguous[ly]" contradict the statements in his declaration in which he explains why he believes Defendants sent the phishing e-mails. Accordingly, Lu's declaration should not be disregarded under the sham affidavit rule.

United States District Court
For the Northern District of California

Because Lu's declaration is admissible and contains sufficient evidence to support an inference that Yang Qi, Jinpeng Li, and ZaagTech violated the CFAA, these Defendants are not entitled to summary judgment on this claim.

I.   California Penal Code section 502 (Claim 10)

PQ Labs alleges that Yang Qi, Jinpeng Li, and ZaagTech violated section 502 of the California Penal Code in two ways: first, by using the company's computer network without its authorization to share confidential hardware schematics with each other in January 2010 and, second, by sending the phishing e-mails discussed above in 2011.

Section 502 was enacted "to expand the degree of protection afforded to individuals, businesses, and governmental agencies from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems." Cal. Penal Code § 502(a).  Among other acts, section 502(c) makes it a public offense for any person to access a "computer, computer system, or computer network" without permission or to "introduce[] any computer contaminant into any computer, computer system, or computer network." Id. § 502(c)(7)-(8).[6]  In addition, section 502(e) provides that the "owner or lessee of the computer, computer system, computer network, computer program, or data who suffers damage or loss by reason of a violation of any of the provisions of subdivision (c) may bring a civil action against the

_____

[6] As with its CFAA claims, PQ Labs failed to identify in its brief the specific provisions of section 502 on which its claims are based. When asked to identify specific provisions at the hearing, PQ Labs indicated that its claims were most likely based on sections 502(c)(7) and 502(c)(8).

**United States District Court**
For the Northern District of California

violator for compensatory damages and injunctive relief or other equitable relief." Id. § 502(e)(1).

To support its section 502 claims, PQ Labs relies on a log of instant messages which allegedly show that Jinpeng Li sent confidential hardware schematics to Yang Qi in January 2010 using the company's computer network. Wolf Decl., Ex. B. It also relies on the statements from Lu's declaration as evidence of Defendants' alleged phishing activities. See Lu Decl. ¶¶ 29-30. While this evidence supports an inference that Defendants violated section 502 by sending the alleged phishing e-mails, it does not support an inference that they also violated the statute by sharing the hardware schematics over PQ Labs' network. This is because, with respect to PQ Labs' claim based on the hardware schematics, Defendants are protected by California Penal Code section 502(h).

Section 502(h) creates a safe harbor from liability for employees who access a computer or computer network within the scope of their employment. Specifically, the provision states,

> Subdivision (c) does not apply to punish any acts which are committed by a person within the scope of his or her lawful employment. For purposes of this section, a person acts within the scope of his or her employment when he or she performs acts which are reasonably necessary to the performance of his or her work assignment.

Cal. Penal Code § 502(h)(1). To avoid this provision, PQ Labs must present some evidence to suggest that Jinpeng Li was acting outside the scope of his employment when he sent the hardware schematics to Yang Qi. It has not done so here. Indeed, nothing in the January 2010 instant message log suggests that Jinpeng Li

24

was not authorized, in his capacity as a hardware engineer, to access to the schematics in question.  See Wolf Decl., Ex. B. Furthermore, nothing in the logs suggests that he was not supposed to share these hardware schematics with Yang Qi, who was still working for PQ Labs at the time.

If anything, PQ Labs' evidence provides reason to believe that Jinpeng Li was, in fact, acting within the scope of his employment when he shared the hardware schematics with Yang Qi in January 2010.  Lu stated in his declaration that Yang Qi and Jinpeng Li were sent to South Korea together that same month to demonstrate PQ Labs' products for a potential business partner. Lu Decl. ¶ 18.  Although PQ Labs asserts that Jinpeng Li shared the schematics with Yang Qi in order "to help develop a new product for a new competitor," it failed to cite any evidence to support that assertion.  See Pls.' Opp. at 21.  In sum, PQ Labs has not presented sufficient evidence to support an inference that Jinpeng Li was acting outside the scope of his employment -- and therefore was not protected by section 502(h) -- when he sent the hardware schematics to Yang Qi.[7]

Thus, while PQ Labs may proceed on its section 502 claims based on the alleged 2011 phishing attack, it may not proceed on its section 502 claims based on the alleged unauthorized use of the company's computer network to share hardware schematics.

---

[7] Although ZaagTech is not protected by section 502(h), PQ Labs has not presented any evidence to suggest that ZaagTech ever sought to access PQ Labs' computer network, outside of its alleged phishing attack in 2011.

J.    Trespass to Chattels (Claim 18)

PQ Labs' asserts a trespass-to-chattels claim against Yang Qi, Jinpeng Li, and ZaagTech based on their alleged 2011 phishing attack.

The "tort of trespass to chattels allows recovery for interferences with possession of personal property 'not sufficiently important to be classed as conversion, and so to compel the defendant to pay the full value of the thing with which he has interfered.'" Intel Corp. v. Hamidi, 30 Cal. 4th 1342, 1350 (2003) (citations omitted).  To prevail on a trespass-to-chattels claim based on "unwanted electronic contact between computers," the plaintiff must establish that the unwanted contact "involved some actual or threatened interference with the computers' functioning." Id. at 1353.

PQ Labs has submitted sufficient evidence of such interference here to survive summary judgment on this claim.  As noted above, Lu's declaration specifically highlighted the "damages to the hardware and network" that allegedly resulted from Defendants' phishing attack.  Lu Decl. ¶ 29.  Yang Qi, Jinpeng Li, and ZaagTech are therefore not entitled to summary judgment on this claim.

K.    Breach of Contract (Claim 14)

PQ Labs alleges that Jinpeng Li breached the confidentiality provisions of his employment contract by disclosing hardware schematics and other proprietary technological information. Jinpeng Li is entitled to summary judgment on this claim because, as noted above, he signed his employment contract with PinQi and never signed a contract with PQ Labs.  Jinpeng Li Decl. ¶ 2.

26

United States District Court
For the Northern District of California

For reasons explained more fully in the discussion of Defendants' motion for leave to amend, PQ Labs is granted leave to amend its complaint by adding PinQi as a Plaintiff. PinQi may revive this contract claim against Jinpeng Li in the amended complaint.

L.   Breach of Fiduciary Duty (Claim 15)

PQ Labs alleges that Jinpeng Li and Yang Qi breached their fiduciary duty to PQ Labs by misappropriating its trade secrets and using them to support ZaagTech.

To prevail on a claim for breach of fiduciary duty under California law, a plaintiff must show (1) the existence of a fiduciary duty; (2) a breach of that fiduciary duty; and (3) resulting damage. Pellegrini v. Weiss, 165 Cal. App. 4th 515, 524 (2008).

Defendants contend that PQ Labs has failed to present sufficient evidence that Jinpeng Li and Yang Qi owed it a fiduciary duty. They note that Jinpeng Li signed an employment contract with PinQi, not PQ Labs, while Yang Qi was merely assigned to work for PQ Labs by his true employer, 22Miles. Both of these arguments fail.

First, with respect to Jinpeng Li, PQ Labs' evidence is sufficient to support an inference that he was a fiduciary of the company. California courts have recognized that the "fiduciary of a subsidiary also owes a fiduciary duty to the subsidiary's parent corporation." Thomas Weisel Partners LLC v. BNP Parabas, 2010 WL 1267744, at *5 (N.D. Cal.); see also Richardson v. Reliance Nat. Indem. Co., 2000 WL 284211 (N.D. Cal.) (refusing to dismiss breach-of-fiduciary-duty claim because defendants owed fiduciary

United States District Court
For the Northern District of California

duty to subsidiary of plaintiff's corporation).  Defendants

concede that PinQi was a wholly owned subsidiary of PQ Labs and

that Jinpeng Li knew of this parent-subsidiary relationship.

Indeed, the undisputed evidence suggests that Jinpeng Li used a

"PQLabs.com" e-mail address throughout his employment with PinQi.

Lu Decl., Ex. G.  In light of this evidence, Defendants' argument

that Jinpeng Li was not a fiduciary of PQ Labs must be rejected.

Defendants' argument that Yang Qi was not a fiduciary of PQ

Labs is similarly unavailing because the evidentiary record

supports an inference that Yang Qi acted as PQ Labs' agent.  As

California courts have explained,

> Agency is "the fiduciary relationship that
> arises when one person (a 'principal')
> manifests assent to another person (an
> 'agent') that the agent shall act on the
> principal's behalf and subject to the
> principal's control, and the agent manifests
> assent or otherwise consents so to act."
> Where such a relationship arises, the agent
> assumes "a fiduciary duty to act loyally for
> the principal's benefit in all matters
> connected with the agency relationship."

Huong Que, Inc. v. Luu, 150 Cal. App. 4th 400, 410-11 (2007)

(citing Restatement (Third) of Agency §§ 1.01, 8.01).  Here, PQ

Labs' evidence suggests that Yang Qi regularly held himself out as

an agent of PQ Labs when dealing with distributors and prospective

customers.  Lu Decl. ¶ 11.  Lu stated in his declaration that Yang

Qi used a "PQLabs.com" e-mail address when communicating with

customers and offering them sales contracts.  Id.  He also

described how Yang Qi traveled to South Korea on behalf of the

company to meet with a potential PQ Labs business partner.  Id.

¶ 18.  This evidence supports an inference that Yang Qi was an

agent of PQ Labs and, therefore, owed the company a fiduciary duty.  <u>Violette v. Shoup</u>, 16 Cal. App. 4th 611, 620 (1993) ("The chief characteristic of the agency is that of representation, the authority to act for and in the place of the principal for the purpose of bringing him or her into legal relations with third parties." (citations omitted)).

Accordingly, because PQ Labs has submitted evidence that Jinpeng Li and Yang Qi owed it a fiduciary duty, Jinpeng Li and Yang Qi are not entitled to summary judgment on this claim.

> M.   Tortious Interference with Prospective Economic
>       Advantage and Contracts (Claims 12, 13, 20)

PQ Labs alleges that Yang Qi and Haipeng Li unlawfully interfered with its prospective economic advantage and contracts by stealing its customers.  Specifically, it contends that Yang Qi and Haipeng Li formed a sham PQ Labs distributor which they then used to divert customers and product sales away from PQ Labs' authorized distributors.  Because the sham distributor -- a company called MultiTouch Group, LLC -- allegedly kept all of the retail profits from these sales for itself, rather than sharing them with PQ Labs as other distributors were required to do, PQ Labs asserts that this scheme deprived it of its full profits on product sales.

To prevail on a claim for tortious interference with prospective economic advantage, a plaintiff must show "'(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the

relationship; (4) actual disruption of the relationship; and
(5) economic harm to the plaintiff proximately caused by the acts
of the defendant.'" Korea Supply Co. v. Lockheed Martin Corp., 29
Cal. 4th 1134, 1153 (2003) (citations omitted).   The standard for
proving tortious interference with contract is essentially the
same as the standard for proving tortious interference with
prospective economic advantage except that it requires proof of a
contractual relationship between the plaintiff and the third
party.   Pac. Gas & Elec. Co. v. Bear Stearns & Co., 50 Cal. 3d
1118, 1126 (1990) ("The tort of interference with prospective
economic advantage protects the same interest in stable economic
relationships as does the tort of interference with contract,
though interference with prospective advantage does not require
proof of a legally binding contract.").

     PQ Labs has submitted sufficient evidence here to support an
inference that Yang Qi and Haipeng Li knowingly disrupted its
relations with its distributors and prospective customers.   It
points to a series of instant messages that Yang Qi and Haipeng Li
exchanged in January and February 2010, during which Yang Qi
solicited Haipeng Li's assistance in forming MultiTouch Group.
See Wolf Decl. ¶ 3, Ex. A, at 1-10.   During these chats, Yang Qi
sent Haipeng Li a confidential pricing list which was typically
used only by PQ Labs' authorized distributors.   Id., Ex. A, at 7-
8.   He explained that they could use this list to undercut the
authorized distributors and divert customers to MultiTouch Group.
Id.   Haipeng Li advised Yang Qi to keep their plans hidden from
his supervisors at PQ Labs and Yang Qi, in turn, advised Haipeng
Li to use a fake name when dealing with customers.   Id., Ex. A, at

United States District Court
For the Northern District of California

2, 6.  While these communications do not constitute compelling proof that MultiTouch Group actually diverted profits from PQ Labs,[8] they nevertheless support an inference that Yang Qi and Haipeng Li knowingly sought to disrupt PQ Labs' relations with its distributors and prospective customers.  This evidence is therefore sufficient to support PQ Labs' claim for tortious interference with prospective economic advantage.

This evidence is not sufficient, however, to support PQ Labs' claim for tortious interference with contracts.  PQ Labs has not provided a single contract -- either with a distributor or with a customer -- which was allegedly disrupted by Yang Qi and Haipeng Li.  Without this evidence, PQ Labs' claim for tortious interference with contracts cannot survive summary judgment.  See Pac. Gas & Elec. Co., 50 Cal. 3d at 1126 (recognizing that tortious interference with contract requires "proof of a legally binding contract").

_____

[8] As noted at the hearing, PQ Labs' theory of liability rests on its allegation that "authorized" distributors were required to return a portion of their retail profits to PQ Labs after every sale of a PQ Labs product.  If these distributors were not required to return a portion of their retail profits to PQ Labs after these sales -- and, instead, simply paid a wholesale price to PQ Labs and kept all of the retail profits for themselves -- then PQ Labs would not be harmed by Defendants' efforts to divert sales from authorized distributors to MultiTouch Group.

Despite the centrality of this factual allegation to its underlying tortious interference claims, however, PQ Labs has not submitted any distribution agreements to show that its distributors actually share their retail profits.  PQ Labs' failure to submit this evidence -- all of which should be in its own possession -- casts doubt on whether Yang Qi and Haipeng Li's alleged scheme actually deprived PQ Labs' of its full profits.  Nevertheless, because the Court must draw all reasonable inferences in a light favorable to the non-moving party, it concludes that the evidence outlined above is sufficient to satisfy PQ Labs' summary judgment burden.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Defendants contend that PQ Labs cannot survive summary judgment on its claim for tortious interference with prospective economic advantage without presenting evidence that Haipeng Li or Yang Qi owed PQ Labs a fiduciary duty or duty of confidentiality. This argument misstates the law.  While a plaintiff must demonstrate that the defendant's conduct was "wrongful by some legal measure other than the fact of interference itself," Korea Supply, 29 Cal. 4th at 1153, it can satisfy this requirement without showing a specific breach of a fiduciary duty or duty of confidentiality.  In the present case, for instance, PQ Labs has met this requirement by presenting evidence that Yang Qi breached the confidentiality provisions of his contract with 22Miles by sharing PQ Labs' pricing information with Haipeng Li.

Further, the record contains sufficient evidence to suggest that Yang Qi did breach his fiduciary duty to PQ Labs, as explained above.  It also contains evidence that Haipeng Li knowingly aided Yang Qi in breaching that duty.  This evidence is sufficient to satisfy the "wrongful" element of PQ Labs' claim for tortious interference with prospective economic advantage and precludes granting summary judgment to Yang Qi and Haipeng Li on this claim.

N.   Fraudulent Concealment (Claim 16)

PQ Labs alleges that Yang Qi is liable for fraudulent concealment because he failed to disclose his efforts to form MultiTouch Group while he was serving as PQ Labs' account manager. Defendants contend that this claim fails because PQ Labs has not presented any evidence that Yang Qi owed it a fiduciary duty.  As explained above, however, PQ Labs' evidence is sufficient to

**United States District Court**
For the Northern District of California

support an inference that Yang Qi was a fiduciary of PQ Labs.
Thus, Yang Qi is not entitled to summary judgment on this claim.

    O.   Conversion (Claim 17)

    PQ Labs alleges that Yang Qi and Haipeng Li took possession
of a touch-screen monitor in February 2010 and then sold it
through MultiTouch Group without PQ Labs' authorization.  As a
result, PQ Labs alleges, it was deprived of the full profits that
it would have earned had the monitor been sold through an
authorized distributor.

    To prevail on a claim for conversion, a plaintiff must show:
(1) ownership or right to possess the subject property; (2) the
defendant's conversion by a wrongful act or disposition of the
property; and (3) damages.  Spates v. Dameron Hospital Ass'n, 114
Cal. App. 4th 208, 221 (2003).

    PQ Labs cites the same evidence to support its conversion
claim that it cited to support its tortious interference claims:
specifically, the log of instant messages exchanged by Yang Qi and
Haipeng Li in January and February 2010.  See Wolf Decl. ¶ 3, Ex.
A, at 1-10.  Once again, while this evidence does not persuasively
demonstrate that PQ Labs was harmed by Yang Qi and Haipeng Li's
efforts to use MultiTouch Group to distribute PQ Labs products, it
is nevertheless sufficient to satisfy PQ Labs' burden on summary
judgment.  The instant message log is sufficient to support an
inference that Yang Qi and Haipeng Li disposed of PQ Labs' touch-
screen monitor without its consent and thereby deprived it of the
profits it would have otherwise earned from the sale of that
monitor.  Accordingly, Yang Qi and Haipeng Li are not entitled to
summary judgment on this claim.

United States District Court
For the Northern District of California

P.   Unfair Competition (Claims 8, 9, 11, 20, 21)

PQ Labs' unfair competition claims are based on the same allegations underlying its claims for trademark infringement, trespass to chattels, breach of fiduciary duty, fraudulent concealment, tortious interference with prospective economic advantage, misappropriation of trade secrets, and other claims discussed above.  Because all of those other claims survive, so, too, do these derivative claims for unfair competition.  See Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co., 20 Cal. 4th 163, 180 (1999) ("By proscribing 'any unlawful' business practice, section 17200 borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." (quoting Cal. Bus. & Prof. Code § 17200)).

II.  Motion for Leave to Amend

Defendants seek leave to amend their answer and one of their responses to PQ Labs' requests for admission.  Specifically, they seek leave to withdraw their admission that Jinpeng Li signed an employment contract with PQ Labs.  Defendants contend they made this admission, both in their answer and during discovery, based on Jinpeng Li's mistaken translation of his employment contract with PinQi, the Shanghai-based subsidiary of PQ Labs.

PQ Labs does not dispute that Jinpeng Li signed an employment contract with PinQi.  Furthermore, it has not presented any evidence to suggest that Jinpeng Li actually signed an employment contract directly with PQ Labs.  In fact, the translated version of the Jinpeng Li's June 2009 employment contract that PQ Labs submitted with its brief refers specifically to PinQi -- not PQ

34

Labs -- as Jinpeng Li's employer.  See Wolf Decl., Ex. H.  In
light of this undisputed evidence, PQ Labs may not rely on
Defendants' mistaken admissions as a basis for establishing that
Jinpeng Li contracted directly with PQ Labs.

Defendants are granted leave to amend their answer and their
response to PQ Labs' Request for Admission No. 2 by withdrawing
their admission that Jinpeng Li signed an employment contract with
PQ Labs.  However, based on this correction to the record, PQ Labs
is granted leave to amend its complaint by adding PinQi as a
Plaintiff.  PinQi may revive the breach of contract claim against
Jinpeng Li in the amended complaint.

CONCLUSION

For the reasons set forth above, Defendants' motion for
summary judgment (Docket No. 78) is GRANTED in part and DENIED in
part.  Specifically, Yang Qi and Haipeng Li are granted summary
judgment on Plaintiff's claim for prospective interference with
contract and Yang Qi and Jinpeng Li are granted summary judgment
on Plaintiff's state and federal claims for trademark infringement
and false advertising.  While Plaintiff may pursue declaratory and
injunctive relief against ZaagTech on its trademark infringement
and false advertising claims, it may not seek monetary damages on
these claims.

Defendants' objections to Plaintiff's evidence (Docket Nos.
101, 102) are OVERRULED because they lack merit, are not timely,
and were not contained in Defendants' brief as required by the
local rules.

Finally, Defendants' motion for leave to amend (Docket No.
96) is GRANTED.  Defendants may withdraw their admission that

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  Jinpeng Li signed a contract with PQ Labs.  However, in light of

2  the timing of Defendants' request for leave to amend, PQ Labs is

3  granted leave to amend its complaint to add PinQi as a Plaintiff.

4  PQ Labs and PinQi shall file their third amended complaint within

5  four days of this order.  They shall amend their complaint only

6  the minimum amount necessary to add PinQi as a Plaintiff and to

7  identify which Plaintiff is asserting which claims.  They may not

8  add any new claims and must file a redline version of the third

9  amended complaint highlighting all changes to the 2AC.  Defendants

10  shall file their answer to the third amended complaint within

11  seven days of this order.

12      A final pretrial conference will be held at 2:00 p.m. on

13  February 26, 2014.  As stated at the hearing, the parties shall

14  participate in a settlement conference with a magistrate judge

15  before the final pretrial conference.

16      IT IS SO ORDERED.

17

18  Dated: 1/29/2014                    CLAUDIA WILKEN
                                    United States District Judge
19

20

21

22

23

24

25

26

27

28