IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

PQ LABS, INC., and SHANGHAI PINQI          No. 12-0450 CW
DIGITAL TECHNOLOGY CO., LTD.,
                                           FINDINGS OF FACT
         Plaintiffs,                       AND CONCLUSIONS OF
                                           LAW
    v.

YANG QI; ZAAGTECH, INC.; JINPENG
LI; and HAIPENG LI,

         Defendants.
═══════════════════════════════/

    Plaintiffs PQ Labs, Inc. and Shanghai PinQi Digital

Technology Co., Ltd. (PinQi) brought this action against

Defendants Yang Qi, Jinpeng Li and Zaagtech, Inc. and former

Defendant Haipeng Li for misappropriation of trade secrets,

copyright infringement, trademark infringement, breach of

contract, and various other business-related torts.  A bench trial

on these claims was held between March 10, 2014 and March 13,

2014.  After considering all of the testimony, documentary

evidence, and arguments of counsel presented during and after

trial, the Court enters the following findings of fact and

conclusions of law.

                        FINDINGS OF FACT

I.   The Parties

    A.   PQ Labs & PinQi

    PQ Labs is a California corporation which designs, develops,

manufactures, and sells hardware and software in the form of

multi-touch screen overlays, which turn regular monitors into touch-screen monitors.  The company was formed in October 2008 by its current CEO, Fei "Frank" Lu.  Trial Tr. 165 (Lu).  It has offices in San Jose and China.

Mr. Lu is also the CEO of PinQi, a Chinese corporation based in Shanghai.  PinQi is a wholly owned subsidiary of PQ Labs.  Id. 165-66.

B.   Yang Qi

Yang Qi is a Chinese citizen and current CEO of Zaagtech. Trial Tr. 283 (Qi).  In February 2009, he was hired to serve as an independent contractor in PQ Labs' San Jose office.  Id. 283. Although Mr. Lu interviewed Yang Qi for the position and made the decision to hire him, he relied on a human resources consulting firm called 22Miles to hire Yang Qi officially.  Mr. Lu testified that he relied on 22Miles because he lacked sufficient American business experience to obtain the necessary employment visa for Yang Qi.  Id. 58 (Lu).

Yang Qi was a trusted agent for Plaintiffs.  Beginning in March 2009, he was tasked with managing PQ Labs' global sales operations and frequently traveled around the world to meet with prospective customers and distributors.  Id. 366-67 (Qi).  His official title at PQ Labs -- reflected in his email signature, internal business documents, and business cards -- was "Vice President of Sales and Marketing."  Id.  This role gave him access to the company's confidential pricing information and customer lists.  Id. 378, 390.  In addition, Yang Qi had the authority to enter into sales contracts on behalf of PQ Labs and did enter into such contracts on the company's behalf without obtaining approval

United States District Court
For the Northern District of California

from Mr. Lu.  Id. 61 (Lu).  He also supervised company interns and often operated independently when Mr. Lu was working in Shanghai. Id. 61-62.  Although he was officially paid a salary by 22Miles, he received a commission from PQ Labs, worked exclusively for PQ Labs, referred to PQ Labs as "my company" in his online chats with friends, and did not do any work for 22Miles during his employment there.  Id. 285-86, 376-377 (Qi).

Yang Qi was terminated from his employment at PQ Labs in April 2010.  Id. 293-94.  That same month, he decided to found a competing multi-touch technology company called Zaagtech.  Id. 284-85.

C.   Jinpeng Li

Jinpeng Li is a Chinese citizen and current Chief Technology Officer of Zaagtech.  Trial Tr. 411 (J. Li).  In July 2009, he signed an employment contract to work for PinQi in Shanghai as a hardware engineer.  Ex. 16.[1]  Mr. Lu testified that he intended for California law to apply to the employment contract, which states that it is to be applied "in accordance with other laws and regulations" besides those of the People's Republic of China. Trial Tr. 73-74; Ex. 16 at 1.

_____

[1] Attached to the employment contract was an employee handbook, which the contract incorporates by reference.  Ex. 16 at 1.  The employee handbook contains certain confidentiality provisions, including that "the staff of the Company shall have the obligations and responsibilities for confidentiality works by holding the Company's trade secrets such as technologies and business in strict confidence."  Id. 7-8.  The employee handbook further prohibits employees from disclosing to those outside the company the following: customer information, sales information, intellectual property in product drawings, and other corporate data, and provides, "Employees shall not take away the Company's confidential information or its proprietary products and data." Id. 8.

United States District Court
For the Northern District of California

Jinpeng Li was a trusted agent of Plaintiffs.  He was promoted to the position of Technical Director, in which role he was responsible for designing hardware schematics and design prototypes, understanding how the company's software interacts with the hardware, and occasionally initiating and leading new research and development projects.  Id. 70-72.  While still working for PinQi he began performing work for Zaagtech, discontinuing work for PinQi two months later in June 2010.  Id. 420, 424-25 (J. Li).  He signed an employment contract to work for Zaagtech in September 2010.  Id. 422-23.

D.   Zaagtech

Zaagtech is a Chinese corporation which develops, manufactures, and sells multi-touch technology products.  Trial Tr. 92, 152-53 (Lu); 444-45 (J. Li).  It competes directly with PQ Labs and PinQi.  Yang Qi founded the company in early 2010 and had it incorporated in June 2010.  Id. 300.

E.   Haipeng Li[2]

Haipeng Li is a Chinese citizen who has never worked for PQ Labs or PinQi.  In January 2010, he and Yang Qi formed a company called Multitouch Group to serve as a distributor for PQ Labs' touchscreen products.  Trial Tr. 286, 376-77 (Qi).  The two planned to use PQ Labs' customer lists to divert sales of PQ Labs' touchscreen devices to Multitouch Group and to share whatever

---

[2] Haipeng Li was the only Defendant who did not testify or appear in Court for trial.  Although Plaintiffs asserted during their opening statement that Haipeng Li remains a Defendant in this action, Trial Tr. 7, they referred to him as a "former defendant" in their post-trial briefs.  Docket No. 176, Pls.' Opening Post-Trial Br. 4.

profits they made.  Id. 377-78.  They used this list to direct one sale of a PQ Labs product to Multitouch Group.  Id. 382-84.

II.   Facts Relevant to Plaintiffs' Claims

    A.   Plaintiffs' Trade Secrets

To avoid disclosing any of Plaintiffs' proprietary information, the Court refers to the nine technological trade secrets that Plaintiffs have asserted here as Trade Secrets 1 through 6 and 8 through 10.  Without describing these asserted trade secrets in detail, the Court notes that some of the asserted trade secrets pertain to hardware and circuitry design while others pertain to software.  The Court finds that Plaintiffs have identified each of these trade secrets with particularity.

Plaintiffs have also shown that they derived independent economic value from these secrets.  Mr. Lu specifically explained how each of the asserted technological trade secrets enabled Plaintiffs to produce their touchscreen products more efficiently than their competitors.  Trial Tr. 105-32, 143-44.

The economic value of this technology is further evidenced by Plaintiffs' efforts to ensure that the technology was not publicly disclosed.  The trial record demonstrates that Plaintiffs employed a variety of safeguards to protect the secrecy of their proprietary technology.  Plaintiffs required all of their employees to sign confidentiality agreements.  Id. 46 (Lu).  Jinpeng Li signed such an agreement with PinQi in July 2009.  Id. 72-73; Exs. 15-16.  Mr. Lu testified that he also regularly reminded his employees of the importance of protecting the companies' latest technological developments.  Trial Tr. 46, 190-91.  Yang Qi admitted that he remembers receiving an email

**United States District Court**
For the Northern District of California

1  specifically instructing him not to share PQ Labs' confidential

2  information with people outside of the company.  <u>Id.</u> 425.

3       In addition to the employee confidentiality agreements, PQ

4  Labs employed other security measures to ensure that its

5  technological secrets remained protected.  These included the use

6  of security cameras to prevent employees from removing any

7  physical hardware from the company's offices and fingerprint-

8  activated door locks to control access to its research facilities.

9  <u>Id.</u> 44-45.  PQ Labs also used secure servers to store its

10  information and expressly prohibited its employees from copying

11  files on their work computers to USB drives.  <u>Id.</u> 45 ("When they

12  leave the company for the day, they are not allowed to bring these

13  company documents with [them].").  Employees were even prohibited

14  from sending technological information -- such as software codes

15  and hardware schematics -- over email between the company's

16  Shanghai and San Jose offices because the San Jose employees did

17  not perform any technological work.  <u>Id.</u>

18       PQ Labs undertook similar efforts to protect its confidential

19  customer information.  For instance, it maintained all of its

20  information about pricing and customers in a Google spreadsheet

21  which it made accessible only to its sales employees.  <u>Id.</u> 148-51;

22  Exs. 23-26.  The company also took steps to store confidential

23  customer information in specific places on its server in order to

24  prevent non-sales employees from accessing it.  Trial Tr. 52-54.

25       Although Plaintiffs did not produce a copy of any signed

26  confidentiality agreement between Yang Qi and PQ Labs, they did

27  produce a copy of the agreement that PQ Labs entered into with

28  22Miles.  That agreement specifically provided that Yang Qi would

**United States District Court**
For the Northern District of California

protect PQ Labs' confidential information.  Trial Tr. 62-63; Ex. 18.  Plaintiffs also produced a copy of a separate agreement between 22Miles and Yang Qi under which Yang Qi agreed to keep PQ Labs' information confidential.  Trial Tr. 63-64; Ex. 19.  Based on this evidence, the Court finds that Plaintiffs undertook reasonable efforts to protect the trade secrets that they have asserted in this case.

The trial record also demonstrates that Defendants misappropriated Plaintiffs' technological trade secrets for use in making and selling Zaagtech's touchscreen products.  Yang Qi emailed himself copies of PQ Labs' confidential customer lists and pricing spreadsheets three days before he was terminated.  Trial Tr. 395-99 (Qi).  He also admitted that he sought and received copies of PQ Labs' confidential hardware schematics from Jinpeng Li via email and online chats in January and February 2010, even though PQ Labs never directed him to engage in any technical work requiring access to these schematics.  Id. 196 (Lu); 292, 298 (Qi).  During one of these chats, Jinpeng Li specifically praised Yang Qi's efforts to create a competing company using PQ Labs' proprietary technology.  Id. 330 (Qi).[3]  Yang Qi was also

_____

[3] The Court notes that the parties dispute whether or not the words Jinpeng Li used to describe Yang Qi should be translated as "master of copying" or "master of reverse-engineering."  The translation in the record -- to which both parties stipulated -- uses the term "master of copying," Ex. 9, and Defendants failed to produce any evidence suggesting that this term should be translated differently.  Jinpeng Li did not testify about which translation he prefers.  In any event, regardless of whether the term is more accurately translated as "master of copying" or "master of reverse-engineering," the chat logs clearly indicate that Jinpeng Li supported Yang Qi's efforts to use PQ Labs' proprietary technology to form a competing company.

soliciting other friends during this same time period to help him develop touchscreen hardware and software modeled after PQ Labs' products.  Id. 297-99.

Plaintiffs' expert, Dr. Andrew Wolfe, testified at length about the ways in which Zaagtech's touchscreen products incorporate Plaintiffs' technological trade secrets.  Id. 257-71. Although Defendants' expert, Dr. Sandeep Chatterjee, testified that many of these trade secrets could be reverse-engineered with relative ease, he never made any attempt to do so himself.  Nor did he explain how reverse-engineering could yield the many specific similarities -- including portions of nearly identical source code -- that Dr. Wolfe identified between Zaagtech's products and PQ Labs' products.

In light of Defendants' failure to prove that Defendants actually obtained Plaintiffs' trade secrets through reverse-engineering, the Court finds that Zaagtech gained access to these trade secrets through Yang Qi and Jinpeng Li's misappropriation of PQ Labs' proprietary technology.  In addition, the Court finds that both Yang Qi and Jinpeng Li willfully and maliciously misappropriated Plaintiffs' trade secrets.

B.   Plaintiffs' Copyright

PQ Labs owns a copyright in the "PQ Labs MultiTouch System Software," Copyright Registration No. TXu 1-620-335.  No witness testified at trial about the specific content or purposes of the copyrighted software.

C.   Plaintiffs' Trademark

PQ Labs owns the "PQ Labs" trademark, Trademark Registration No. 4075660.  Trial Tr. 97-98; Ex. 54.  As of January 2012,

United States District Court
For the Northern District of California

Zaagtech used the PQ Labs trademark in internet advertisements to suggest that Zaagtech was a manufacturer and distributor of PQ Labs' touchscreen products.  Id. 94-97, 353-55; Exs. 56-58.  For example, one advertisement read: "Zaagtech Inc. is a professional next window, ir touch, PQ labs [sic] manufacturer and exporter in China.  We are specializing in next window, ir touch, PQ labs." Ex. 56.  This statement was false on its face and has the tendency to deceive its audience and to influence purchasing decisions.  By placing the advertisements on the internet, Zaagtech put them into interstate commerce.  Zaagtech removed those advertisements only after receiving a takedown notice from PQ Labs.  Trial Tr. 94-97, 353-55.

D.    "Phishing"[4] Emails

Plaintiffs maintain a network of computers, which they use for ordinary business purposes.  Trial Tr. 154-55.  Between January 26, 2011, and December 12, 2011, Plaintiffs' employees received at least seven phishing emails containing viruses or other harmful computer programs.  Id. 155-62; Ex. 32.  Those emails contained indications that the sender (or senders) was Chinese, and that the sender was familiar with Plaintiffs' products.  Id. 155-61.  As a result of these phishing emails,

---

[4] "Phishing involves an attempt to acquire information such as usernames, passwords, or financial data by a perpetrator masquerading as a legitimate enterprise.  Typically, the perpetrator will provide an e-mail or link that directs the victim to enter or update personal information at a phony website that mimics an established, legitimate website which the victim either has used before or perceives to be a safe place to enter information." Patco Constr. Co. v. People's United Bank, 684 F.3d 197, 204 n.5 (1st Cir. 2012).

Plaintiffs were forced to expend some $280,000 on network upgrades, consulting fees, and other operating costs.  <u>Id.</u> 162. However, the evidence at trial was not sufficient to demonstrate that Defendants were responsible for the phishing emails.

III. Facts Relevant to Damages

From August 2010 (the time that Zaagtech entered the market) until July 2013, the price of Plaintiffs' products fell approximately eighty-three percent.  Trial Tr. 500.[5]  As a result of that price erosion, although Plaintiffs' overall sales increased, compared with projections, profits fell.  <u>Id.</u> 465-66, 478, 481, 483, 489.[6]  And although Plaintiffs' overall sales continued to increase after Zaagtech's entry into the market, sales of Plaintiffs' 52-inch and 60-inch monitors decreased. <u>Id.</u> 478.

The precise amount of lost profits, whether due to price erosion or lost sales, cannot be determined from the evidence produced at trial.  Plaintiffs claim that price erosion cost them $5.37 million in lost profits, based on projections that presumed sales trends and prices would have remained constant had Zaagtech not entered the market.  <u>Id.</u> 465-466.  In addition, Plaintiffs claim that the lower-than-projected sales of their 52-inch and 60-inch monitors cost them another $1.89 million in lost profits. <u>Id.</u> 477-78.

_____

[5] By comparison, during the same period the price for televisions fell approximately 43 percent.  Trial Tr. 500.

[6] The "projections" referred to in this section are sales projections made by Plaintiffs' expert, Dr. Mark Berkman, based on past sales trends.  Trial Tr. at 481.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Neither of these claims is credible.  Plaintiffs' presumed damages from lost sales are not based on Zaagtech's sales figures; instead, they are derived by comparing projections based on Plaintiffs' past sales trends with Plaintiffs' actual sales during the study period.  Id. 481, 518.  The three-year projected sales trends are based on as little as three months' data.  Id. 520-22. This undermines the credibility of Plaintiffs' claim regarding sales.  In addition, although Zaagtech was Plaintiffs' most direct competitor, Plaintiffs' projections ignore numerous other competitors in the market.  Id. 484-503, 515-16.  This undermines the credibility of Plaintiffs' assumption that the price of their products would have remained constant during the study period. Consequently, the Court has no reliable data concerning the lost profits Plaintiffs suffered as a result of Zaagtech's entry into the market.

By misappropriating Plaintiffs' trade secrets, Defendants were spared the costs of research and development.  The misappropriated trade secrets took approximately 3,580 hours to develop, at a cost of approximately $214,800.  Id. 105-06, 110, 114, 118, 122, 125, 130, 132, 144-45.

Finally, Plaintiffs suffered $650 in lost profits as a result of the sale that Yang Qi diverted from PQ Labs to the Multitouch Group.  Id. 613.

CONCLUSIONS OF LAW

I.   Liability

A.   Misappropriation of Trade Secrets (Claims 1, 2)

Plaintiffs allege that Yang Qi, Jinpeng Li, and Zaagtech misappropriated nine of their trade secrets pertaining to

11

proprietary technology.  They also allege that these Defendants
stole confidential customer information, including "pricing
history, pricing, customer information and sales data."  Pls.'
Opening Post-Trial Br. 6.

To prevail on a claim for misappropriation of trade secrets
under the California Uniform Trade Secrets Act (CUTSA), Cal. Civ.
Code §§ 3426 through 3426.11, a plaintiff must show that (1) it
owned a trade secret; (2) the defendant acquired, disclosed, or
used that trade secret through improper means, and (3) the
defendant's actions damaged the plaintiff.  Cytodyn, Inc. v.
Amerimmune Pharmaceuticals, Inc., 160 Cal. App. 4th 288, 297
(2008).  CUTSA defines a "trade secret" as

> information, including a formula, pattern,
> compilation, program, device, method,
> technique, or process, that:
>
> (1)  Derives independent economic value,
>      actual or potential, from not being
>      generally known to the public or to other
>      persons who can obtain economic value
>      from its disclosure or use; and
>
> (2)  Is the subject of efforts that are
>      reasonable under the circumstances to
>      maintain its secrecy.

Cal. Civ. Code § 3426.1(d).

As set forth in the findings of fact, Plaintiffs derived
independent economic value from their asserted trade secrets.
Specifically, the technological trade secrets allowed them to
manufacture touchscreen products more efficiently than their
competitors.  Likewise, their confidential customer information
enabled them to engage in targeted pricing and marketing.  Thus,
both the technological information and customer information had
sufficient economic value to satisfy the first prong of CUTSA's

United States District Court
For the Northern District of California

trade secret definition.  See MMCA Grp., LTD v. Hewlett-Packard Co., 2010 WL 147937, at *3 (N.D. Cal.) (noting that an "'alleged trade secret derives actual or potential economic value if a competitor cannot produce a comparable product without a similar expenditure of time and money'" (citations omitted)); Morlife, Inc. v. Perry, 56 Cal. App. 4th 1514, 1522 (1997) ("[A] customer list can be found to have economic value because its disclosure would allow a competitor to direct its sales efforts to those customers who have already shown a willingness to use a unique type of service or product as opposed to a list of people who only might be interested.").

Plaintiffs also showed that they made reasonable efforts to protect their asserted trade secrets.  As noted above, they relied on a variety of protective measures including employee non-disclosure and confidentiality agreements, secure servers, controlled access to their research facilities, and strict company rules governing the sharing and copying of electronic information. Courts have recognized that procedures like these generally constitute "reasonable" efforts to protect trade secrets under CUTSA.  See MAI Systems Corp. v. Peak Computer, Inc., 991 F.2d 511, 521 (9th Cir. 1993) ("MAI required its employees to sign confidentiality agreements respecting its trade secrets, including the Customer Database.  Thus, under the [C]UTSA, the MAI Customer Database constitutes a trade secret."); Religious Tech. Ctr. v. Netcom On-Line Communication Servs., Inc., 923 F. Supp. 1231, 1253-54 (N.D. Cal. 1995) (finding that the plaintiff organization "put forward sufficient evidence that it took steps that were reasonable under the circumstances to protect its purported trade

United States District Court
For the Northern District of California

secrets" by submitting a declaration from its president documenting the organization's use of "security personnel," "electronic sensors attached to documents," and "confidentiality agreements for all of those given access to the materials").

Defendants argue that Plaintiffs' efforts to protect their trade secrets were not sufficient because Plaintiffs waited roughly twenty months after Yang Qi's and Jinpeng Li's employment ended to file the instant lawsuit. Defendants also note that Plaintiffs did not mark their products as confidential and failed to use certain security measures, such as "potting," to prevent reverse-engineering of their technological trade secrets. The Court previously rejected all of these arguments in its summary judgment order. Docket No. 113, Jan. 29, 2014 Order 9-12. Plaintiffs need not employ every conceivable method of protecting their trade secrets in order to show that they made "reasonable" efforts to do so. Defendants have not attempted to distinguish their most recent arguments from those which were previously raised and rejected. Instead, they rely on the same case law and evidence that they cited in their summary judgment briefs. Because Defendants' arguments remain unavailing, the Court concludes that Plaintiffs' asserted trade secrets satisfy the definition set forth in CUTSA.[7]

---

[7] Defendants raise one new argument in their post-trial brief: that "Plaintiffs have not discharged their burden to show that PinQi owns any of the alleged trade secrets in this case." Docket No. 180, Defs.' Post-Trial Br. 10. This argument is undermined by Mr. Lu's testimony that he viewed the asserted trade secrets in this case as belonging to both PQ Labs and PinQi. Trial Tr. 42. Moreover, Defendants do not dispute that PQ Labs owned all of the trade secrets asserted here, nor do they dispute that PinQi is a wholly owned subsidiary of PQ Labs; as such,

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

The trial record demonstrates that Yang Qi and Jinpeng Li misappropriated these trade secrets by disclosing them -- without Plaintiffs' consent -- to Zaagtech, which then used them to produce, market, and sell its own competing touchscreen products. As explained above, Defendants' use of these trade secrets ultimately caused economic harm to Plaintiffs.  Accordingly, Defendants' conduct constitutes misappropriation of trade secrets under CUTSA.

B.   Copyright Infringement (Claim 3)

Plaintiffs did not raise any arguments in support of their copyright infringement claim in their post-trial briefs and conceded that they had presented "limited evidence" to support this claim at trial.  Pls.' Opening Post-Trial Br. 23.  Thus, the Court concludes that Defendants did not infringe Plaintiffs' copyright.

---

Defendants implicitly acknowledge that their liability would remain the same regardless of whether or not PinQi co-owned any of the asserted trade secrets.  Indeed, when the Court raised this point at trial and asked Defendants whether PinQi's ownership of the trade secrets was relevant, Defendants' counsel stated, "I'll yield the point."  <u>Id.</u> 171-72.

C.   Trademark Infringement and False Advertising

Plaintiffs bring claims against for trademark infringement and false advertising, alleging that Zaagtech[8] violated both the Lanham Act and California state law by using the mark "PQ Labs" in internet advertising, thereby falsely suggesting that it was a distributor and manufacturer of PQ Labs' touch-screen products.

1.   Trademark Infringement: Lanham Act (Claim 5)

"To prevail on a claim of trademark infringement under the Lanham Act, 15 U.S.C. § 1114, a party 'must prove: (1) that it has a protectible ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion.'"  Network Automation, Inc. v. Advanced Sys. Concepts, Inc., 638 F.3d 1137, 1144 (9th Cir. 2011) (citing Dep't of Parks & Recreation v. Bazaar Del Mundo Inc., 448 F.3d 1118, 1124 (9th Cir. 2006)).

As set forth in the findings of fact, the trial record demonstrates that Plaintiffs had an ownership interest in the PQ Labs trademark, which Zaagtech infringed by using that mark without authorization in a manner that falsely suggested a formal business relationship between Plaintiffs and Zaagtech, and, therefore, was likely to cause confusion.

2.   False Advertising: Lanham Act (Claim 6)

To prevail on a claim for false advertising under the Lanham Act, a plaintiff must show:

---

[8] The Court granted Defendants Yang Qi and Jinpeng Li summary judgment on Plaintiffs' trademark and false advertising claims against them.

16

> (1) a false statement of fact by the defendant
> in a commercial advertisement about its own or
> another's product; (2) the statement actually
> deceived or has the tendency to deceive a
> substantial segment of its audience; (3) the
> deception is material, in that it is likely to
> influence the purchasing decision; (4) the
> defendant caused its false statement to enter
> interstate commerce; and (5) the plaintiff has
> been or is likely to be injured as a result of
> the false statement, either by direct diversion
> of sales from itself to the defendant or by a
> lessening of the goodwill associated with its
> products.

Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1139 (9th Cir. 1997) (citing 15 U.S.C. § 1125(a)).  The first element may be met by showing "that the statement was literally false, either on its face or by necessary implication."  Id. (citing Castrol Inc. v. Pennzoil Co., 987 F.2d 939, 946 (3d Cir. 1993)).

As set forth in the findings of fact, the trial record demonstrates that Zaagtech's advertisement, which stated that it was "PQ labs [sic] manufacturer and exporter in China" was literally false on its face.  The statement has the tendency to deceive its audience and to influence purchasing decisions.  By placing the advertisement on the internet, Zaagtech put it into interstate commerce.

The trial record does not, however, show that Plaintiffs suffered damages as a result of Zaagtech's false advertising; consequently, Plaintiffs may not recover damages for it.  Harper House, Inc. v. Thomas Nelson, Inc., 889 F.2d 197, 210 (9th Cir. 1989) ("a competitor need not prove injury when suing to enjoin conduct that violates section 43(a), . . .  In a suit for damages under section 43(a), however, actual evidence of some injury

resulting from the deception is an essential element of the plaintiff's case" (emphasis in original)).

### 3. False Advertising: California Law (Claim 7)

Section 17500 of the California Business and Professions Code makes it unlawful for a business to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." To prevail on a claim under this provision, "it is necessary only to show that members of the public are likely to be deceived" by a given advertisement. Kasky v. Nike, Inc., 27 Cal. 4th 939, 951 (2002). As demonstrated in Part I.C.3, above, the trial record demonstrates that Zaagtech engaged in advertising that was likely to deceive members of the public. Consequently, Plaintiffs are entitled to injunctive relief. Kasky, 27 Cal. 4th at 951.

### D. Tortious Interference with Prospective Economic Advantage (Claims 12, 13)

Plaintiffs allege that Defendants unlawfully interfered with their prospective economic advantage by stealing their customers.

To prevail on a claim for tortious interference with prospective economic advantage, a plaintiff must show "'(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts

United States District Court
For the Northern District of California

of the defendant.'"   <u>Korea Supply Co. v. Lockheed Martin Corp.</u>, 29 Cal. 4th 1134, 1153 (2003) (citations omitted).

As set forth in the findings of fact, the trial record demonstrates that Yang Qi deliberately diverted at least one PQ Labs sale to Multitouch Group, the company that he had formed with Haipeng Li.  Doing so evidenced all of the elements of this claim.

E.   Phishing Email Claims

1.   California Penal Code Section 502 (Claim 10)

Section 502 was enacted "to expand the degree of protection afforded to individuals, businesses, and governmental agencies from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems."  Cal. Penal Code § 502(a).  Among other acts, section 502(c) makes it a public offense for any person to access a "computer, computer system, or computer network" without permission or to "introduce[] any computer contaminant into any computer, computer system, or computer network."  <u>Id.</u> § 502(c)(7)-(8).  In addition, section 502(e) provides that the "owner or lessee of the computer, computer system, computer network, computer program, or data who suffers damage or loss by reason of a violation of any of the provisions of subdivision (c) may bring a civil action against the violator for compensatory damages and injunctive relief or other equitable relief."

Here, Plaintiffs failed to present evidence sufficient to show that Defendants were responsible for the phishing attacks. Thus, Plaintiffs are not entitled to relief on this claim.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

2.   Trespass to Chattels (Claim 18)

The "tort of trespass to chattels allows recovery for interferences with possession of personal property 'not sufficiently important to be classed as conversion, and so to compel the defendant to pay the full value of the thing with which he has interfered.'" Intel Corp. v. Hamidi, 30 Cal. 4th 1342, 1350 (2003) (quoting Prosser & Keeton, Torts (5th ed. 1984) § 14, pp. 85-86).  To prevail on a trespass-to-chattels claim based on "unwanted electronic contact between computers," the plaintiff must establish that the unwanted contact "involved some actual or threatened interference with the computers' functioning." Id. at 1353.

Again, because they failed to provide evidence sufficient to show that Defendants were responsible for the phishing attacks, Plaintiffs are not entitled to relief on this claim.

3.   Computer Fraud and Abuse Act (Claim 19)

"The CFAA prohibits a number of different computer crimes, the majority of which involve accessing computers without authorization or in excess of authorization, and then taking specified forbidden actions, ranging from obtaining information to damaging a computer or computer data." LVRC Holdings LLC v. Brekka, 581 F.3d 1127, 1131 (9th Cir. 2009).  Among other acts, the statute makes it unlawful for any person to "knowingly cause[] the transmission of a program, information, code, or command, and as a result of such conduct, intentionally cause[] damage without authorization, to a protected computer."  18 U.S.C. § 1030(a)(5)(A).  One circumstance that allows a plaintiff to bring a civil action under the CFAA is the "loss to 1 or more

persons during any 1-year period . . . aggregating at least $5,000 in value."  18 U.S.C. §§ 1030(c)(A)(1)(I), 1030(g).

Once again, because they failed to present evidence sufficient to show that Defendants were responsible for the phishing attacks, Plaintiffs are not entitled to relief on this claim.

F.   Breach of Contract (Claim 14)

PinQi alleges that Jinpeng Li breached the confidentiality provisions of his employment contract by disclosing hardware schematics and other proprietary technological information.

"The elements of a cause of action for breach of contract are: 1) the existence of the contract; 2) performance by the plaintiff or excuse for nonperformance; 3) breach by the defendant; and 4) damages." McNeary-Calloway v. JP Morgan Chase Bank, N.A., 863 F. Supp. 2d 928, 954 (N.D. Cal. 2012).

Jinpeng Li breached the confidentiality provisions of his employment agreement with PinQi by transmitting Plaintiffs' hardware schematics to Yang Qi and by using those hardware schematics to generate hardware schematics for Zaagtech's products, causing damage to Plaintiffs.

G.   Breach of Fiduciary Duty (Claim 15)

PQ Labs alleges that Jinpeng Li and Yang Qi breached their fiduciary duty to PQ Labs by misappropriating its trade secrets and using them to support Zaagtech.

To prevail on a claim for breach of fiduciary duty under California law, a plaintiff must show (1) the existence of a fiduciary duty; (2) a breach of that fiduciary duty; and

(3) resulting damage.  Pellegrini v. Weiss, 165 Cal. App. 4th 515, 524 (2008).

Here, both Jinpeng Li and Yang Qi were trusted agents who had fiduciary duties to Plaintiffs.  Jinpeng Li, as an employee of PinQi, had a fiduciary duty to both his employer and to PQ Labs as PinQi's owner.  See Thomas Weisel Partners LLC v. BNP Parabas, 2010 WL 126774, at *5 (N.D. Cal.); see also Richardson v. Reliance Nat'l Indem. Co., 2000 WL 284211 (N.D. Cal.) (refusing to dismiss breach of fiduciary duty claim because defendants owed fiduciary duty to subsidiary of plaintiff's corporation).  Yang Qi, although he was nominally employed by 22Miles, also had a fiduciary duty as an agent of Plaintiffs.  Huong Que, Inc. v. Luu, 150 Cal. App. 4th 400, 410-11 (2007); see also 3 Witkin, Summary of California Law Agency § 100 (10th ed. 2005) ("An agent or employee is under a duty not to compete with his or her principal on matters connected with the agency, unless the principal and the agent otherwise agree.").  As set forth above, these Defendants breached that duty by misappropriating Plaintiffs' trade secrets and disclosing them to Zaagtech, which then used them to produce, market, and sell its own competing touchscreen products, causing economic harm to Plaintiffs.

H.   Fraudulent Concealment (Claim 16)

PQ Labs alleges that Yang Qi is liable for fraudulent concealment because he secretly formed Multitouch Group while he served as PQ Labs' account manager.

To prevail on a claim for fraudulent concealment under California law, "(1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under

United States District Court
For the Northern District of California

a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage." Levine v. Blue Shield of Cal., 189 Cal. App. 4th 1117, 1126-27 (2010).

Yang Qi does not dispute that his involvement with Multitouch Group was a material fact, that he concealed that fact, that had he not concealed that fact PQ Labs likely would have acted differently, or that PQ Labs sustained damages as a result of his concealment.  Yang Qi argues only that he cannot be liable for fraudulent concealment because owed no fiduciary duty to PQ Labs. However, the Court already has determined that Yang Qi did have a fiduciary duty to PQ Labs as that company's agent.  Thus, Yang Qi is liable for fraudulent concealment.

I.    Conversion (Claim 17)

Plaintiffs allege that Yang Qi took possession of a touch-screen monitor in February 2010 and then sold it through Multitouch Group without PQ Labs' authorization, thereby depriving PQ Labs of the full profit it would have earned on that sale.

To prevail on a claim for conversion, a plaintiff must show: (1) ownership or right to possess the subject property; (2) the defendant's conversion by a wrongful act or disposition of the property; and (3) damages.  Spates v. Dameron Hosp. Ass'n, 114 Cal. App. 4th 208, 221 (2003).

United States District Court
For the Northern District of California

As the findings of fact show, Yang Qi took possession of at least one touch-screen monitor, which he sold through Multitouch Group, thereby depriving Plaintiffs of $650 in lost profits. Therefore, Yang Qi is liable for conversion.

J.   Unfair Competition (Claims 4, 8, 9, 11, 20, 21)

Plaintiffs' unfair competition claims are based on the same allegations underlying its claims for trademark infringement (Claim 4); false advertising (Claims 8, 9); phishing emails (Claim 11); tortious interference with prospective economic advantage (Claim 20); and breach of fiduciary duty (Claim 21).

1.   Unfair Competition: Trademark Infringement
     (Claim 4)

Claims of unfair competition alleging trademark infringement under California law are "subject to the same test" as trademark infringement claims under the Lanham Act.  Jada Toys, Inc. v. Mattel, Inc., 518 F.3d 628, 631 n.1, 632 (9th Cir. 2008) (citations omitted); see also Mallard Creek Indus., Inc. v. Morgan, 56 Cal. App. 4th 426, 435 (1997) (in trademark infringement and unfair competition claims, "the ultimate test under both federal and California law is whether the similarity between the two marks is likely to deceive or confuse the public.").  Thus, because the trial record demonstrates that Zaagtech infringed PQ Labs' mark under the Lanham Act, it also infringed and engaged in unfair competition under California law.

2.   Unfair Competition: False Advertising (Claims 8, 9)

As set forth above, Defendants' description in an internet advertisement of itself as "PQ labs [sic] manufacturer and exporter in China" constituted false advertising under California

United States District Court
For the Northern District of California

law.  Thus, it also constituted unfair competition under
California law.

### 3.   Unfair Competition: Phishing Emails (Claim 11)

As set forth above, Plaintiffs failed to present evidence
sufficient to show that Defendants were responsible for the
phishing attacks.  Plaintiffs are not entitled to relief on this
claim.

### 4.   Unfair Competition: Tortious Interference with Prospective Economic Advantage (Claim 20)

As set forth above, Plaintiffs demonstrated that Defendants
interfered with Plaintiffs' business relationships by interposing
Multitouch Group between Plaintiffs and at least one customer,
thereby depriving Plaintiffs of at least $650 in lost profits.
This constitutes unfair competition under California law.  See
Angelica Textile Servs., Inc. v. Park, 220 Cal. App. 4th 495, 510
(2013) ("conduct needed to maintain a statutory or common law
unfair competition cause of action may consist of tortious
interference with business relations").

### 5.   Unfair Competition: Breach of Fiduciary Duty (Claim 21)

As set forth above, Plaintiffs demonstrated that Defendants
Jipeng Li and Yang Qi breached their fiduciary duty to Plaintiffs
by misappropriating and disclosing Plaintiffs' trade secrets.
This constitutes unfair competition under California law.  See
Bancroft-Whitney Co. v. Glen, 64 Cal. 2d 327, 355 (1966) (where
there is a "causal relationship" between a defendant's breach of
fiduciary duty and a new competitive enterprise, the breach of
fiduciary duty also constitutes unfair competition).

II.   Remedy

    A.   Damages

        1.   Misappropriation of Trade Secrets

The CUTSA provides, in relevant part:

> (a)  A complainant may recover damages for the
> actual loss caused by misappropriation.  A
> complainant also may recover for the unjust
> enrichment caused by misappropriation that is not
> taken into account in computing damages for actual
> loss.
> . . .
> (c)  If willful and malicious misappropriation
> exists, the court may award exemplary damages in an
> amount not exceeding twice any award made under
> subdivision (a) or (b).

Cal. Civ. Code § 3426.3.

    As set forth in the findings of fact, the only actual loss Plaintiffs were able to demonstrate at trial was $650 in lost profits that resulted from Yang Qi's diversion of an individual sale from Plaintiffs to Multitouch Group.  In addition, the trial record demonstrates that Defendants were unjustly enriched by $214,800 by their misappropriation of trade secrets, which spared them the expense of conducting their own research and development. Thus, Plaintiffs are entitled to an award of actual damages in the amount of $215,450.

    In addition, the Court finds that Yang Qi and Jinpeng Li engaged in willful and malicious misappropriation,[9] and awards Plaintiffs exemplary damages in the amount of $430,900.

---

    [9] Zaagtech is not, itself, liable for exemplary damages because, "[u]nder California punitive damages law, a company simply cannot commit willful and malicious conduct -- only an individual can."  Taiwan Semiconductor Mfg. Co. v. Tela Innovations, Inc., 2014 U.S. Dist. LEXIS 101657, at *20-21 (N.D. Cal.).

2.   Other Claims

Plaintiffs provided no evidence that it incurred economic damages as a result of Zaagtech's infringement of the PQ Labs trademark.  The Ninth Circuit has made clear that, in order to recover monetary damages for trademark infringement, a plaintiff "must prove both the fact and the amount of damage."  Lindy Pen Co., Inc. v. Bic Pen Corp., 982 F.2d 1400, 1407 (9th Cir. 1993). Similarly, a plaintiff in a California state law trademark action must prove damages in order to recover damages.  Cal. Bus. & Prof. Code § 14250(a).  Consequently, Plaintiffs cannot recover damages for Zaagtech's infringement of their trademark.

B.   Injunction

The Lanham Act provides this Court with power to grant injunctive relief "to prevent the violation of any right of the registrant of a registered mark in the Patent and Trademark Office."  15 U.S.C. § 1116(a).  In addition, under California's unfair competition law "relief is generally limited to injunctive relief and restitution."  Walker v. Countrywide Home Loans, Inc., 98 Cal. App. 4th 1158, 1179 (2012).

The Court finds that Plaintiffs are entitled to an injunction barring Defendants from any further misappropriation of Plaintiffs' trade secrets, infringement of Plaintiffs' trademarks, or engaging in any false or deceptive advertising with regard to Plaintiffs and their products.

C.   Attorneys' Fees and Costs

Plaintiffs seek an award of attorneys' fees resulting from their claims for misappropriation of trade secrets, trademark infringement, and false advertising.  Defendants seek an award of

attorneys' fees resulting from their defense of the copyright claim.

### 1.   Misappropriation of Trade Secrets (Claims 1, 2)

The CUTSA provides that where "willful and malicious misappropriation exists, the court may award reasonable attorney's fees and costs to the prevailing party."  Cal. Civ. Code § 3426.4. As set forth above, the Court finds and concludes that Yang Qi and Jinpeng Li willfully and maliciously misappropriated Plaintiffs' trade secrets.  Consequently, Plaintiffs are entitled to an award of attorneys' fees and costs resulting from their misappropriation of trade secrets claims.

### 2.   Copyright Infringement (Claim 3)

Defendants argue that they, as the prevailing party on the copyright claim, are entitled to an award of attorneys' fees. Under 17 U.S.C. § 505, the court may in its discretion award the prevailing party reasonable attorneys' fees and costs.  See also Seltzer v. Green Day, Inc., 725 F.3d 1170, 1180 (9th Cir. 2013) ("It is important to recall that the Supreme Court rejected the so-called British Rule where the loser pays; rather, attorneys fees are left up to the discretion of the district court" (citing Fogerty v. Fantasy, 510 U.S. 517, 533 (1994)).  However, Defendants give the Court no reason to exercise that discretion, aside from the mere fact that they successfully defended against a single claim.  The Court will not award attorneys' fees on the copyright claim.  See Arp Films, Inc. v. Marvel Entm't Grp., Inc., 952 F.2d 643, 651 (9th Cir. 1991) (in litigation with a "mixed outcome," "the district court was well within its discretion in concluding that plaintiffs were not prevailing parties within the

meaning of section 505 . . . and accordingly were not entitled to costs or attorneys' fees").

### 3.   Trademark Infringement and False Advertising

Congress amended the Lanham Act in 1975 expressly to permit the recovery of reasonable attorneys' fees in "exceptional cases." See 15 U.S.C. § 1117(a).  "While the term 'exceptional' is not defined in the statute, generally a trademark case is exceptional for purposes of an award of attorneys' fees when the infringement is malicious, fraudulent, deliberate or willful."  Lindy Pen, 982 F.2d at 1409.  Since the 1975 amendment, "numerous courts have awarded attorneys' fees to trademark owners who prosecuted actions against willful and deliberate infringers and counterfeiters."  Playboy Enters., Inc. v. Baccarat Clothing Co., 692 F.2d 1272, 1276 (9th Cir. 1982).

The Court concludes that this is an exceptional case. Defendants deliberately misrepresented themselves as Plaintiffs' "manufacturer and exporter in China," and used Plaintiffs' trademark to do so.  Plaintiffs are entitled to an award of attorneys' fees resulting from their trademark infringement and false advertising claims.[10]

### CONCLUSION

Plaintiffs' claims against Haipeng Li are dismissed for failure to prosecute.

---

[10] Plaintiffs may not recover attorneys' fees for their unfair competition claims, even those that mirror their trademark and false advertising claims.  Walker, 98 Cal. App. 4th at 1179 (California unfair competition law "does not provide for attorney fees").

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

The clerk shall enter judgment for Plaintiffs on their claims for misappropriation of trade secrets, trademark infringement, false advertising, tortious interference with prospective economic advantage, breach of contract, breach of fiduciary duty, conversion, and unfair competition related to the same.

The clerk shall enter judgment for Defendants on Plaintiffs' claim of copyright infringement, California Penal Code section 502, trespass to chattels, the Computer Fraud and Abuse Act, and unfair competition related to the same.

For their claim of misappropriation of trade secrets, Plaintiffs are awarded $215,450 in actual damages jointly and severally against Yang Qi, Jinpeng Li, and Zaagtech; and $430,900 in exemplary damages jointly and severally against Yang Qi and Jinpeng Li.

Defendants are hereby enjoined from any further misappropriation of Plaintiffs' trade secrets, infringement of Plaintiffs' trademarks, or false advertising concerning Plaintiffs.  An injunction shall issue separately.

As the successful party in this action, Plaintiffs are entitled, as set forth above, to recover reasonable attorneys' fees and costs they have incurred in prosecuting this action, the amount of which shall be determined by post-judgment motion. Plaintiffs may, within fourteen days of entry of judgment, make a motion for attorneys' fees and costs, which must be accompanied by declarations and exhibits demonstrating the number of hours expended, hourly rates, and itemized costs which Plaintiffs' seek

to recover.[11]   Defendants may, within fourteen days after Plaintiffs make their motion, file an opposition only as to the amount and apportionment of fees and costs, <u>not</u> as to eligibility. Pursuant to Civil Local Rule 54-5, the parties are ordered to meet and confer regarding Plaintiffs' motion for attorneys' fees and costs within fourteen days of entry of judgment.

     At trial, each side objected to some of the evidence submitted by the opposing side.  The Court has reviewed these evidentiary objections and has not relied on any inadmissible evidence.  The Court will not discuss each objection individually. To the extent that the Court has relied on evidence to which one side has objected, such evidence has been found admissible and the objections are overruled.

     IT IS SO ORDERED.


Dated:  September 30, 2014

CLAUDIA WILKEN
United States District Judge

---

[11] Because Plaintiffs are entitled to recover attorneys' fees and costs only for certain causes of action, their declarations must either demonstrate that the time expended and/or the itemized cost was related to one of those causes of action, or must set forth a rationale for apportionment of time expended and/or expenses where the amount sought involved multiple causes of action.

United States District Court
For the Northern District of California